**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **(1) INTERNATIONAL UNION,** | § | |
| **UNITED AUTOMOBILE, AEROSPACE** | § | |
| **AND AGRICULTURAL IMPLEMENT** | § | |
| **WORKERS OF AMERICA and** | § | |
| **(2) LOCAL 1558,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | **Civil Action No.** 21-CV-054-SPS |
| **v.** | § | |
| | § | |
| **(1) SPIRIT AEROSYSTEMS HOLDINGS,** | § | |
| **INC. and (2) SPIRIT AEROSYSTEMS, INC.** | § | |
| | § | |
| | § | |
| **Defendants** | § | |

**COMPLAINT**

Plaintiffs International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Local 1558 (jointly referred to as *Union*) complain of Defendants, Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc.  Pursuant to Local Rule 3.1, Plaintiffs state that this action is not related to any action previously filed in this Court.

**Preliminary Statement**

1.     This civil action arises out of Defendants Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc.'s repudiation of the express terms of a collective bargaining agreement with Plaintiffs International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its affiliated Local 1558.  Several provisions of the parties' agreement obligate Spirit AeroSystems, Inc. to maintain all bargaining unit work at its plant in McAlester, Oklahoma, for the duration of the parties' collective bargaining agreement (*CBA*), until at least December 7, 2025.  Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc. have repudiated and are continuously breaching material terms of the contract by colluding to close

the entire McAlester plant and relocate all its work to other of Spirit AeroSystems, Inc.'s facilities, and lay off all employees in the McAlester bargaining unit in violation of the CBA. The employer initially kept its closure plans secret from the Union. By these actions, the companies have engaged in a campaign to dismantle the bargaining unit recognized in the contract with the result that at least 127 bargaining unit employees are in imminent danger of losing their jobs.

2.      The Union has filed a grievance against Spirit AeroSystems, Inc. in accordance with the negotiated grievance and arbitration procedure to redress the Company's violations of the labor contract. The Union is seeking expedited arbitration of its grievance. The Union has brought this civil action seeking a preliminary injunction to maintain the status quo, prevent irreparable injury, and ensure that arbitration is a meaningful remedy when the labor dispute is presented to an arbitrator for determination.

## Parties

3.      Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (*UAW*) is based in Detroit, Michigan. UAW is an international labor organization engaged in representing or acting for employees in an industry affecting interstate commerce as defined in the National Labor Relations Act, as amended, 29 U.S.C. §§ 142(1), (3), and 152(5), (6) and (7). UAW has a major presence in the aerospace and transportation industries, with more than 400,000 active members and more than 580,000 retired members in the United States, Canada and Puerto Rico.

4.      Plaintiff Local 1558 is a local labor organization that is based in McAlester, Oklahoma and is affiliated with UAW. Local 1558 represents, and at all relevant times has represented, the bargaining unit employees at Spirit AeroSystems, Inc.'s plant in McAlester.

5.      Defendant Spirit AeroSystems Holdings, Inc. (*Spirit Holdings*) is a corporation

organized and existing under the laws of the state of Delaware. Spirit Holdings was incorporated on February 7, 2005. In early 2005, Spirit Holdings acquired The Boeing Company's manufacturing facilities in Wichita, Kansas, Tulsa, Oklahoma and McAlester, Oklahoma. The Company commenced operations on June 17, 2005.

6.      Defendant Spirit AeroSystems, Inc. (*Spirit* or *Company*) is a wholly owned subsidiary of Spirit Holdings headquartered in Wichita. According to the Company's website, in addition to its Wichita, Tulsa and McAlester locations, it also has locations in Kinston, North Carolina; Biddeford, Maine; San Antonio, Texas; Prestwick, Scotland; Belfast, Northern Ireland; Subang, Malaysia; Casablanca, Morocco; and Saint-Nazaire, France. *See* https://www.spiritaero.com/company/overview/overview/. It is a seven billion dollar global company having more than 14,800 employees worldwide, with about 8,000 of those employees being located at the company's corporate headquarters in Wichita. *Id.* Spirit is an employer in an industry affecting interstate commerce within the meaning of the National Labor Relations Act.

## Jurisdiction

7.      The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185.

## Venue

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Spirit has a major manufacturing plant in McAlester, Oklahoma, the parties' collective bargaining agreement applies to all operations and unit employees of that plant, and this action is based on events that occurred in this judicial district.

## Facts

### *Local 1558 and Spirit AeroSystem's Plant in McAlester, Oklahoma*

9.      Spirit is one of the largest independent designers and manufacturers of commercial aerostructures in the world, and it is the largest independent supplier of aerostructures to Boeing, one of the largest aircraft manufacturers in the world.  Ex. A, ¶ 8.[1]  Aerostructures are structural components such as fuselages, propulsion systems and wing systems for commercial and military aircraft.  *Id*.

10.     In early 2005, Boeing was operating its commercial aircraft manufacturing plant located at located at 1900 E. Electric Avenue in McAlester (*Plant*).  Ex. A, ¶ 4.  In 2005, Boeing sold the Plant to its current owner, Spirit.  *Id*.  Spirit employees at the McAlester Plant fabricate aerospace parts such as clips, brackets, stiffeners, sub-assemblies, Krueger flaps, and webbings, approximately 97 percent for Boeing and three percent for Airbus.  Ex. A, ¶ 8.  The Boeing parts are for large passenger aircraft such as the 737, 747, 777, and 787.  *Id*.

11.     Spirit is one of McAlester's major employers in terms of the number of persons employed and quality of jobs with benefits, and it is a vital asset to the community in many ways.  Ex. A, ¶ 6.  The employees support the local economy and schools, and the Plant and its employees are significant contributors to the local tax base.  *Id*.  The Plant's employees support the McAlester community in other ways as well.  *Id*.  For example, Local 1558 members donated $20,000 to E-Angels, which provides year-round assistance to help meet the essential needs of children.  *Id*. Local 1558, through the Good Neighbor Fund, also donated $15,000 to the TLC Wig Closet, a charitable organization that provides wigs, hats, scarves, and other needed items to cancer victims through the McAlester Regional Health Center Foundation.  *Id*.

---

[1] All exhibits referenced herein are included in the *Appendix to Complaint* (*Appendix*) filed contemporaneously herewith.  Exhibit A in the Appendix is the *Declaration of David Barker*.

12.     Spirit has many long-term employees in McAlester.  Ex. A, ¶ 7.  Some employees have worked at the Plant for over 25 years, and one has worked there for 30 years.  *Id*.  Three generations of several families have been employed at the Plant.  *Id*.  In 2014, one "day one" employee celebrated his 50th anniversary of employment.  *Id*.

***Collective Bargaining Agreement Between Spirit AeroSystems and the Union***

13.     At the time Spirit purchased the McAlester Plant from Boeing in 2005, the employer recognized UAW and Local 1558 as exclusive representative of the bargaining unit under the terms of a successorship clause in the Union's collective bargaining agreement (*CBA*) with Boeing.  Ex. A, ¶ 9.  Spirit and the Union have had a collective bargaining relationship in McAlester since 2005.  Since then, the Union has represented all hourly-rated employees in production, maintenance, and quality job classifications at the Plant.  *Id*.

14.     The duration of the parties' first CBA was a five-year term that became effective in 2005 and expired in accordance with its terms in October 2010.  Ex. A, ¶ 10.  Local 952, representative of the Tulsa bargaining unit, was a party to the same labor contract with Spirit.  *Id*.

15.     Before the 2005 CBA was set to expire in October 2010, both Local 1558 and Local 952 began bargaining a new contract with Spirit.  *Id*.  The parties' negotiations culminated in a successor CBA between Spirit, UAW, Local 952 and Local 1558, effective December 19, 2010, for a ten-year term ending November 30, 2020.  *Id*.

16.     Notably, the 2010 CBA was a state-of-the art contract effecting a new collaborative collective bargaining system, a less adversarial model of bargaining that emphasizes each party's recognition of the vital interests of the other party and working together to solve problems for the benefit of the employer and employees.  Ex. A, ¶ 11.  It is designed to give the Union *a seat at the table*.  *Id*.  Representatives of the Union and Company met for one week in Oklahoma City for the purpose of learning about collaborative bargaining.  *Id*.  The ten-year term of the CBA was

unprecedented and reflected the parties' intent to implement a long-term commitment to stability and job security.  *Id.*

17.     In the *Foreword* to the 2010 CBA, the parties acknowledged their agreement to "work together in a cooperative manner."  Ex. A-1, UAW 000003.  In a section of their *Foreword* entitled *Job Security*, the parties agreed that they had a mutual long-term interest in the long-term financial success and growth of the Company's Oklahoma operations:

> **Job Security**
>
> The Union and the Company understand and agree that they have a strong and mutual interest in the long-term financial success and growth of the Company's Oklahoma operations.  An essential component of that success and growth is the maintenance of a strong, highly skilled, and sustainable workforce in Oklahoma consistent with the Company's need to remain viable and cost competitive over the long term in the global aerospace industry.
>
> A long-term agreement gives Company customers assurance of future stability and enables the Company to expand current programs and purse new programs to be placed in Tulsa and McAlester.  **In making program decisions, the Company's intent over the long term will be to maintain and, if possible, expand the workforce in Tulsa and McAlester.  The Company considers the maintenance of a strong highly skilled workforce in Tulsa and McAlester to be an important Company priority.**

Ex. A-1, UAW 000003 (emphasis added).

18.     In Article 23 of the CBA, entitled *Partnership and Joint Programs,* the parties agreed that they would work together in specific ways for their mutual benefit:

> During 2010 negotiations, Spirit AeroSystems and the United Aerospace Workers agreed that the development of a true mutually agreed to "Joint Program" would be an effective way to meet the ever-increasing challenges in the global marketplace. There is mutual recognition by both parties that the challenges in the marketplace will continue requiring fundamental changes in the workplace and that we must work together to our mutual benefit to develop and implement a successful Joint Program.

Ex. A-1, UAW 000103.

19.     To that end, the parties agreed to "jointly develop a mutually beneficial partnership:"

> The Company and the Union have committed to jointly develop a mutually beneficial

partnership in order to achieve the highest levels of quality and productivity possible. This partnership is based upon a commitment to create a new era in labor-management relations. The key goals of the partnership are to improve participation, flexibility, productivity, quality and the financial performance of the Company, while enhancing earning opportunities, long-term employment, job satisfaction and safety for employees.

*Id.*

20.     The parties unequivocally stated in the 2010 CBA that "[i]t is "the express intent of the Company and the Union that this Agreement shall remain in effect for its full term." Ex. A-1, § 24.5, UAW 000106 (emphasis added). The parties further agreed that in the event the Company were to sell, lease, or otherwise transfer all its Tulsa or all its McAlester operations, the contract would bind the Company's successors and assigns. *Id.*

21.     The parties had a good working relationship under the 2010 CBA until 2017, when Spirit's executives advised the UAW that the Company needed immediate concessions related to health care costs. Ex. A, ¶ 12. At that time, the McAlester bargaining unit included approximately 300 employees and the Tulsa bargaining unit had approximately 1,700 employees. *Id.*

22.     David Barker (*Barker*) is an International Representative for UAW's Region 5 (now Region 3), including Local 1558 and Local 952. Ex. A, ¶ 2. In early 2017, he attended a meeting at UAW headquarters in Detroit, Michigan, where top executives from Spirit pleaded their case for concessions to UAW leadership. Ex. A, ¶ 13. Spirit executives anticipated growth in the Oklahoma Operations if the Union agreed to changes in health care. *Id.* After the meeting, Barker was assigned by his Regional Director to continue discussions with the Company and then report back to him. *Id.* In the spring of 2017, he met with various executives of Spirit at their request and they requested specific changes to the 2010 CBA, primarily having to do with the structure of the health insurance program. *Id.* At this meeting, Company officials informed Barker that they were considering relocating the Oklahoma Operations to another state. *Id.* Shortly thereafter, Barker had a second meeting with the executives in March or April 2017, at which time the Company

requested many other changes in addition to the health insurance changes.  *Id*.  At that point, Barker was still merely gathering information rather than negotiating, and he believed the Company was asking the Union for too many concessions.  *Id*.  He reported his findings to his Regional Director, including the Company's threat to relocate to another state.  *Id.*  They decided to move forward and see if they could reach a resolution that was acceptable to the membership.  *Id*.  They were interested in maintaining and growing the Oklahoma Operations as well as avoiding a protracted battle with the Company over relocation of the work.  *Id*.  After a couple more meetings, the Company and the Union began negotiations and then reached a tentative agreement on amendments to the 2010 CBA. *Id*.

23.      When the membership first took a vote on the proposed changes to the 2010 CBA, the entire membership of Local 1558 in McAlester rejected any contract amendments, primarily due to the drastic changes that Spirit had proposed to the health insurance program.  Ex. A, ¶ 14. A couple of weeks after the first membership vote, the Company proposed that the contract changes only apply to Local 952 in Tulsa, but Barker refused to allow McAlester employees to be removed from the negotiations.  *Id*.

24.      The Company then made it clear to both Locals Unions that it would move their work to a facility in Alabama if it did not obtain the requested concessions. Ex. A, ¶ 15.  Believing Spirit's threat to be genuine and not wanting to engage in a protracted fight with the Company, the members then took a second vote and accepted the proposed modifications to the 2010 CBA, including extending the CBA to 2025.  *Id*.  The 2017 modifications were set forth in a July 8, 2017, Letter of Understanding between the parties that is now Exhibit H to the CBA.  *See* Ex. A-1, UAW 000138-183 (CBA Exhibit H).

25.      The major concessions that Spirit extracted in the CBA included substantial changes to the employer-sponsored health insurance program, the deletion of Market Base Pay Review

along with the addition of Periodic Equity Review, a change in job progression increases from 12 to 22 weeks, changes to the hours of labor that reduced employee overtime, and a phasing out of the Company's logistics business.  Ex. A, ¶ 16.

26.    Although many of the requested concessions were hard for the Union to swallow, the major contract issue in 2017 was health insurance.  Ex. A, ¶ 17.  Spirit secured the Union's agreement to participate in Solidarity Health, a concierge-style primary care physician model providing limited primary care services at no cost.  *Id*.  However, bargaining unit members also had to participate in a Health Reimbursement Arrangement to cover all services outside of the basic medical services that Solidarity Health provided, with higher deductibles and higher out-of-pocket maximums for all medical services outside those limited services provided by Solidarity Health. *Id*.

27.    In keeping with the Union's focus on enhancing job security in return for the 2017 concessions, the Union obtained Spirit's agreement to extend the term of the 2010 CBA for an additional five years of job security and work retention for the bargaining unit to December 7, 2025, and a $2,000 ratification bonus for each bargaining unit employee.  Ex. A, ¶ 18.  The concessions made in the 2017 modifications were not popular, but the Union's highest priority in those negotiations was to maintain the current jobs and create a foundation to increase jobs throughout the Oklahoma Operations covered by the CBA.  *Id*.  The 2010 CBA already provided significant job security for employees at the McAlester Plant and the 2017-2025 amendments renewed and strengthened those commitments.  *Id*.  Retaining the work and jobs at the Plant over the long term was critically important because Spirit is such a huge part of the local community and because so many local families had worked at Spirit and its predecessors for two or three generations.  *Id*.

28.    The 2010 CBA prohibited Spirit from closing the Plant and relocating bargaining unit work.  It required the employer to retain unit work and jobs in McAlester with limited

exceptions defined in the CBA. Ex. A, ¶ 19. Local 1558's members accepted the 2017 concessions to Spirit in the modified CBA in exchange for the Company's continued promise and commitment to retain unit work and jobs during the term of the CBA to its expiration in 2025. *Id*. The current CBA strictly limits management's ability to transfer bargaining unit work to non-unit personnel in McAlester or elsewhere. *Id*.

29.    The CBA, as amended by the 2017 modifications, became effective on July 8, 2017 and remains in full force and effect until December 7, 2025. Ex. A, ¶ 20. *See* Ex. A-1, UAW 000145. At all relevant times since 2010, the CBA has governed the wages, hours of work, and other terms and conditions of employment of all bargaining unit employees. *Id*.

***Spirit Announces Its Intent to Close the Plant and the Union Files a Grievance in October 2020***

30.    In August 2020, Jeff Black, Spirit's Human Resources Site Leader, Oklahoma Operations, called Barker regarding several different matters. Ex. A, ¶ 21. During that conversation, Black casually mentioned to Barker that Spirit was attempting to acquire Asco Aerospace USA in Stillwater, Oklahoma, and that the Company was looking at moving some of the bargaining unit work there, but it seemed very speculative. *Id*. Black did not mention anything to Barker about closure of the Plant. *Id*.

31.    In mid-September 2020, two Local 1558 representatives asked Black about rumors they had heard that the Company was going to close the Plant and move the work to Asco. Ex. A, ¶ 22. Black firmly denied the rumors and said that it would not happen. *Id*.

32.    About two weeks later, on October 1, 2020, Spirit first announced to the McAlester employees and the Local Union that it planned to close the Plant and move the work to its facilities in Wichita, Kansas and Tulsa. Ex. A, ¶ 23. On the same date, the Company gave the McAlester employees a notice under the Worker Adjustment and Retraining Notification (WARN) Act, which requires at least 60 calendar days advance written notice of the closing of a plant. *See* Ex. A, ¶ 23;

Ex. A-2.  The notice stated that "the planned exits are expected to begin December 3, 2020 or within 14 days of that date."  *Id*.

33.     The Company cited the global downturn in the commercial aviation market caused by the pandemic and the grounding of the 737 MAX which left excess production capacity across its global operations as the reason for closing the plant and relocating all bargaining unit work.  Ex. A, ¶ 24.

34.     Prior to making its October 1 announcement, Spirit had already used the layoff provisions of the CBA to address issues caused by the pandemic and the grounding of the 737 MAX.  Ex. A, ¶ 25.  The CBA also has provisions giving the Company the right to use other measures to deal with what the parties identified as catastrophic events including "natural disasters, customer cancellations, program idle times, events beyond control."  *Id*.  The CBA does not provide, as one of those measures to deal with catastrophic events, closing the Plant and relocating all bargaining unit work to other Spirit facilities.  *Id*.

35.     Prior to making its October 1 announcement, Spirit had not informed the UAW of its decisions to close the Plant, relocate the work, and lay off the entire bargaining unit in violation of the CBA.  Ex. A, ¶ 26.  Barker did not hear anything about the announcement from management, but Local 1558 officials contacted him about it and said that Spirit would only talk to them about it if they requested effects bargaining.  *Id*.  On November 2, 2020, after having spoken to Black by telephone, Barker sent Black an e-mail reminding him that Local 1558 had authorized Barker to discuss effects bargaining, and that he was waiting on dates when the Company could meet with the Union on one of the Union's several available dates in November.  *See* Ex. A, ¶ 26; Ex. A-3.

36.     Later Local 1558 officials informed Barker that Black told them the Company may have rushed into the decision and he may rescind the WARN Act notice.  Ex. A, ¶ 27.  Black said he did not know what would happen.  Barker interpreted this to mean that the final decision had

not yet been made by the Company.  *Id*.

37.     By an e-mail dated November 16, Barker confirmed with Black that the Union wanted to meet via Zoom on November 19 and 20, 2020, and made clear that although the Union had agreed to meet, it had not and would not waive any of its rights under the CBA to file a grievance in relation to the announced plant closing.  *See* Ex. A, ¶ 28; Ex. A-4.

38.     In the November 19, 2020 meeting, Barker asked if Spirit had reached a final decision with respect to closing the Plant and relocating the work.  Ex. A, ¶ 29.  Black and Arlene Sokolowski, Director, Human Resources & Boeing Programs, Labor Relations, EEO & ERO Business Partner for Spirit, both informed Barker that the decision was final.  He made clear that the Union disputed that decision.  *Id*.  The remaining discussion focused on the Company's plan to move the machine shop to the Spirit facility in Wichita and the structures to the Spirit facility in Tulsa, but the Company did not know what it would do with the sheet metal work.  *Id*.  At the time, work performed in the McAlester facility was comprised of approximately 60 percent machine shop, 25 percent structures, and 15 percent sheet metal.  *Id*.

39.     Management showed a slide presentation laying out the planned relocation schedule of various work processes and equipment beginning in November 2020; the moves and layoffs were projected to be completed by May 2021.  Ex. A, ¶ 30.  By a cover e-mail under which the Company transmitted the slide presentation to Barker later that day, Black stated that "the plans are all subject to change."  *See* Ex. A, ¶ 30; Ex. A-5.

40.     By letter to Black dated November 24, 2020, Barker enclosed a copy of grievance (MCAL-2020-58319) (*Grievance*).  *See* Ex. A, ¶ 31; Ex. A-6.  By the Grievance, the Union contested the Company's decision to transfer all bargaining unit work from the Plant in violation of the CBA.  *Id*.

41.     In Barker's cover letter to Black, he noted that the Union had made significant

concessions in the 2017 negotiations in exchange for Spirit's continuing promise and commitment of job security, and that the Company was already refusing to live up to its promises three years into the eight-year agreement.  Ex. A, ¶ 32; Ex. A-6.  Barker also made a request for information so that the Union could investigate the Grievance and administer the CBA and demanded that the Company take no action to implement its decision to transfer all bargaining unit work until the matter is resolved in arbitration.  *Id*.

42.     On the next day, November 25, 2020, Justin Welner, Vice President of Human Resources, sent employees a second WARN Act notice.  *See* Ex. A, ¶ 33; Ex. A-7.  Welner stated that the originally announced planned layoffs had been delayed due to a change in business conditions regarding the movement of parts, and that the layoffs were now expected to start on January 28 or within 14 days thereafter and to be completed on or about May 27, or within 14 days of that date.  *Id*.

43.     By an e-mail dated December 2, 2020, Black confirmed that he had received the Grievance.  *See* Ex. A, ¶ 34; Ex. A-8.  He stated that the Grievance should enter the CBA's grievance process at Step Three and that a Step Three meeting had been scheduled in McAlester on December 10.  *Id*.  He also asked Barker for proposed dates to schedule a Step Four grievance meeting for the week of December 14.  *Id*.  The parties agreed to schedule a meeting on December 19, 2020.  *Id*.

44.     By a letter from Black dated December 16, 2020, Spirit responded to the Union's November 24 information request.  *See* Ex. A, ¶ 35; Ex. A-9.  In its response to two requests for studies, surveys and reports that were considered in the decision and for internal memoranda, minutes of meetings, agendas or correspondence relating to the closure decision, the Company stated that it would require an executed non-disclosure agreement because the documents allegedly contained sensitive proprietary information.  *Id*.  Due to Spirit's request for a non-disclosure

agreement, the parties agreed to pause the Step Four of the grievance process.  Ex. A, ¶ 35.

45.     Spirit issued a Step 3 grievance response denying the grievance dated December 16, 2020 but stating that management was ready and willing to bargain the effects of its decision to close the McAlester plant.  *See* Ex. A, ¶ 36; Ex. A-10.  This response disregarded the fact that the parties had already negotiated a CBA in 2010, as modified in 2017, that prohibited closure of the Plant and relocation of the work to other Spirit facilities.  *Id*.

46.     As of January 7, 2021, the Union had the signed non-disclosure agreement and the parties had scheduled a meeting for January 21, 2021, to continue the Step Four grievance process. *Id*. at ¶ 37.  At that January 21 video conference meeting, Spirit presented the Union with two sets of very detailed slide presentations that were subject to the non-disclosure agreement.  *Id*.  One of the presentations, designated the *McAlester Scenario*, explored various scenarios by which Spirit distributed all McAlester unit work among the Wichita, Tulsa, and not-yet acquired Stillwater facilities.  *Id*.  The *McAlester Scenario* file name was dated July 31, 2020, almost six months earlier. The other slide presentation was titled *Project Sooner Surge* and dated September 10, 2020.  *Id*. The *Project Sooner Surge* file also explored options for moving the McAlester Plant work in some still undetermined combination to Wichita, Tulsa, and Stillwater.  *Id*.  At that meeting the Company said that it would take them at least five years to "break even" on the move.  *Id*.

47.     By an e-mail dated February 1, 2021, Black requested an additional Step 4 meeting on the Union's Grievance, stating that the Company had "some clarifying questions about the grievance and would like to discuss what settlement options, if any, the UAW would consider." *See* Ex. A, ¶ 38; Ex. A-11.  Although Step Four of the grievance process was completed, Barker agreed to meet with the Company to answer any questions.  He did not agree that the meeting was a continuation of the earlier Step Four meeting.  *Id*.

48.     The Union then held a meeting with Black on February 3, 2021.  Ex. A, ¶ 39.  It

was evident that Spirit had requested the additional grievance meeting for the sole purpose of delaying the grievance process with the Union and delaying arbitration, as the Company was continuing to move tools and equipment from the Plant to other locations at the same time it was purportedly seeking to continue the Step Four Grievance meeting. *Id*. Management again claimed that the Union had not pointed to any contract language that would prohibit the Company from closing the Plant and moving all bargaining unit work. *Id*. Barker interpreted this as an obvious attempt to delay the grievance and arbitration process because the Union listed the specific contract violations in the Grievance itself and Barker had previously explained the relevance of each cited provision at Step Three and Step Four of the grievance procedure. *Id*. The Company had nothing new to discuss at the February 3, 2021 clarification meeting. *Id*.

**Spirit Has Denied the Union's Grievance, Has Expedited Winding Down the Work, and Has Put the Plant Up for Sale**

49.     By an e-mail to Black dated February 12, 2021, Barker reminded him that Spirit had not yet responded to the Grievance, and that even though the time for responding had passed, the Union still expected an answer. *See* Ex. A, ¶ 40; Ex. A-12. Barker also noted that the Company had not only refused to honor the Union's request to delay the relocation of the work so that the parties could resolve the dispute through the CBA's grievance and arbitration provisions, but that it appeared to have sped up the process while also attempting to delay the arbitration process. *Id*. Thus, Barker demanded that the Grievance "be moved immediately to the arbitration step of the grievance procedure and that the Company agree to expedite the arbitration process." *Id*. Barker asked Black to contact attorney Rod Tanner, an attorney who will represent the Union in arbitration, to schedule a meeting for the parties to select a neutral arbitrator to hear the case. *Id*.

50.     Black responded to Barker's February 12 e-mail that same afternoon, attaching a letter stating that the Company was denying the Grievance. *See* Ex. A, ¶ 41; Ex. A-13.

51.     Prior to Spirit's announcement that it would close the Plant, relocate the work, and lay off all unit employees, Local 1558 had 159 active members in the bargaining unit. Ex. A, ¶ 42. Another 265 members are on layoff from the Plant with recall rights under the CBA. *Id.* These layoffs were due largely to the COVID 19 pandemic and the grounding of Boeing's 737 MAX in March 2019 due to safety concerns. *Id.* Some airlines restarted flying the 737 MAX this month. *Id.*

52.     There are now 127 active members of the bargaining unit working at the Plant, down from the 159 active members prior to the Company's announcement of the Plant closing. Ex. A, ¶ 43. This occurred because as a direct result of Spirit's decision to close the Plant, there have been 30 voluntary retirements and two layoffs. *Id.* Moreover, another six layoffs are scheduled to occur by the end of February 2021. *Id.* Most of the employees who took voluntary retirement would not have done so if Spirit would not have announced that the Plant will close. *Id.* Under the CBA's Voluntary Retirement Program (Art. 19(a)(ii), UAW 000144), employees had to end their employment on or before December 8, 2020, to participate in the VRP and receive the offered lump sum benefit of $50,000. *Id.* Eligible employees were those 55 years of age or older with at least ten years of service. *Id.* Currently, there are also another 50 to 60 salaried, non-unit employees who work at the Plant. *Id.*

53.     Spirit has already begun moving machinery from the Plant to Wichita. Ex. A, ¶ 44. The machines are relatively small in that several of them fit on a regular flatbed trailer. Spirit also has moved work by simply assigning the work to existing machines at another Spirit location and idling machines at McAlester. *Id.* If the movement of work out of McAlester continues its current pace, the Union anticipates that by the end of February 2021, nearly 25 percent of the work will have been moved out of the Plant. *Id.*

54.     In addition, real estate listings online indicate that on January 6, 2021, Spirit

advertised the Plant and the 89 acres on which it is located at 1900 E. Electric Avenue in McAlester as being for sale. *See* Ex. A, ¶ 45; Ex. A-14. In each of these listings, the Property is described as the "former Spirit AeroSystems manufacturing plant." *Id*.

55.     Once bargaining unit members lose their jobs and their health insurance because of the closure of the Plant and the relocation of all bargaining unit work it will be extremely difficult to get an effective remedy in arbitration because those members will have to leave the McAlester area to find comparable employment. Ex. A, ¶ 46. There are no similar jobs in the area. *Id*. In addition, there are no jobs available for McAlester employees at Spirit facilities in Wichita or Tulsa because many employees are on layoff at both facilities. There are almost 5,000 employees on layoff in Wichita alone. *Id*.

56.     Spirit has repeatedly asked Barker to withdraw the Grievance and engage in effects bargaining. Ex. A, ¶ 47. Barker believes Spirit is dismantling McAlester operations as fast as possible hoping that the membership will become disheartened, pushing the Union to withdraw the Grievance and instead engage in effects bargaining. *Id*. Barker believes Spirit also hopes that dismantling the operations and selling the McAlester facility will make it more difficult, if not impossible, for the Union to convince an arbitrator to put it all back together again. *Id*.

57.     To date the Company has not responded to the Union's request to expedite the arbitration and has not even agreed to attempt to select an arbitrator. Ex. A, ¶ 48.

***Relevant Contract Provisions***

58.     As previously noted, the parties agreed in the *Foreword* to the contract that their relationship would be a collaborative and cooperative one, and that they had a mutual long-term interest in the long-term financial success and growth of the Company's Oklahoma operations, which the Company considered to be an important Company priority. *See* Ex. A-1, UAW 000003. The Company stated that its "intent over the long term will be to maintain and, if possible, expand

the workforce in Tulsa and McAlester." *Id*.

59.      In Section 7.1(d) entitled *Contingency Matters*, the parties agreed "that stable long-term employment is beneficial for both the company and the union." *See* Ex. A-1, § 7.1(d), UAW 000035). Thus, they further agreed that "[w]hen a lay off appears imminent the parties will meet to discuss alternatives to lay-offs, including, but not limited to, short work weeks, training, and alternative duty assignments." *Id*. Similarly, although the Company has blamed the pandemic and the problems with the 737 MAX for closing the Plant, relocating the work and laying off the entire bargaining unit, the CBA addresses these types of situations. In this regard, Section 7.1(d)(2) addresses the Company's options in the case of a "catastrophic event," and the Company's available contractual options in such cases do not include for the Company to unilaterally close the entire Plant and relocate the work to other Spirit facilities, and layoff the entire bargaining unit. *Id*. Rather, in the event of a "catastrophic event" to include such things as natural disasters, customer cancellations, and other "events beyond control," the Company's options include to exercise its discretion within specified parameters to institute short work weeks to avoid a layoff. Moreover, the Company had previously dealt with those issues by laying off 265 bargaining unit members. *Id*.

60.      Article 19 places restrictions on the Company's ability to use non-bargaining unit employees to perform bargaining unit work. For example, in Section 19.7, Spirit agreed that "[n]on-bargaining unit employees shall not perform work or operations normally performed by bargaining unit employees," except in the limited circumstances, such as in the case of an emergency. Ex. A-1, § 19.7, UAW 000095. Similarly, the parties negotiated for more job security protections in Section 19.6. Ex. A-1, UAW 000094-095. Section 19.6(a) reserves to the Company the right to subcontract, outsource, or off-load to off-premises sites, any work ordinarily done by bargaining unit employees and to designate where the work is to be performed," the Company is

obligated to first inform and discuss it with the Union, "[e]xcept where time or circumstances prevent it." *Id*. The section contains many other restrictions on the Company's right to outsource, subcontract, or seek assistance from other Spirit locations, including that "[n]o employees in an affected classification shall be laid off or downgraded while external assistance is being utilized in the affected job classification." *Id*.

61.     In Section 20.1(a), the parties agreed that they "will not take any action of any kind that will prevent or impede it in the complete performance of each and every provision hereof." Ex. A-1, § 20.1, UAW 000096.

62.     In the recitals to Exhibit H to the CBA, the Letter of Understanding that contained the 2017 modifications to the CBA, the parties stated that they viewed the modifications as "necessary to better position Oklahoma Operations for growth, and in Section 24.1 of Exhibit H, the parties committed to extend the term of the Agreement to December 7, 2025. *Id*., § 24.1 (Exhibit H) IAW 000145.

63.     Spirit has breached, and continues to breach on an ongoing basis, the CBA including agreements in the CBA's job security and work preservation clauses including, without limitation, the following: Section 7.1 (*Contingency Matters*), Section 19.6 (*Outsourcing, Subcontracting and External Assistance*), Section 19.7 (*Non-Bargaining Unit Employees*), Section 20.1 (*Qualifications*), and Article 24, Section 24.1 of Exhibit H, the parties' July 8, 2017 Letter of Understanding (*Duration*), as well as the *Foreword* to the CBA and the recitals to Exhibit H.

64.     The parties negotiated for the equitable relief of specific performance. In this regard, the contract provides that "[e]ither party shall be entitled to require specific performance of the provisions of this agreement." Ex. A-1, § 20.3(a), UAW 000096.

65.     When asked to identify any provision of the CBA giving it the right to close the Plant while relocating the bargaining unit's work to other Spirit facilities and lay off the entire bargaining

unit, the Company has cited only the management rights clause of Section 5.1 of the CBA.  Ex. A-

1, § 5.1, UAW 000025.  That clause reserves certain rights to the Company; however, it notably does

not reserve the right to the Company to close the Plant while relocating all of the bargaining unit's

work to other Spirit facilities.  Moreover, management's rights under Section 5.1 are modified and

restricted by other provisions of the contract:

> Except as expressly modified or restricted by a specific provision of this
> Agreement, all statutory, common law, and inherent managerial rights,
> prerogatives, and functions are retained and vested exclusively in the Company,
> including, but not limited to, the rights in accordance with its sole and exclusive
> judgment and discretion to: establish reasonable rules and regulation; manage the
> operation; direct the workforce; promote, demote, transfer and/or assign its
> employees; discipline (up to and including discharge) employees for cause;
> determine the number of employees to be employed; hire employees, determine
> their qualifications and assign their work and work locations.

*Id*.

### The CBA's Grievance Procedures and the Union's Request for Expedited Arbitration of the Grievance

66.     Article 9 of the CBA sets forth the parties' grievance and arbitration procedures.

Section 9.2 establishes the grievance framework, including five steps that culminate in final and

binding arbitration.  Ex. A-1, § 9.2, UAW 000042-043.  Section 9.7 provides that certain types of

grievances, including "[m]atters affecting a substantial number of employees in the same manner,"

may be "initiated directly at Step 3 by a Bargaining Committeeperson."  *Id*., § 9.7, UAW 000045.

The contract provides that in Step 3, the Bargaining Committee Chairperson the Bargaining

Committeeperson, the next level of Human Resources, and the next level of management will meet

with the Union at its request, with the intent that the meeting be "an open sharing of information

and facts regarding the grievances." *Id*., Art. 9, § 9.2(c), UAW 000042.  The Company is to give

its decision to the Union within five working days of the meeting.  *Id*.  The Step 3 decision is final

and binding unless it is appealed to Step 4 within five working days of the issuance of the Step 3

decision.  *Id.*, Art. 9, § 9.2(d), UAW 000042.  In Step 4, referred to in the contract as "Pre-Arbitration," a meeting is held between the Bargaining Committee Chair, the Union Local President, a UAW International Representative, a Senior Company Manager, a Human Resources Representative and the Director of Human Resources at the timely request of the Union to discuss all grievances appealed to Step 4.  *Id.*, § 9.2(d), UAW 000042-043.  The Company is required to give its decision to the Bargaining Committee and Union International Representative on all the grievances considered in the meeting within seven working days after the meeting. *Id.*, UAW 000043.

67.     As set forth in Section 9.3, if the Company's Step 4 decision does not satisfactorily settle the grievance, the Union can give written notice to the Company's Plant Human Resources Manager by registered or certified mail within 14 days following the Company's Step 4 decision that it wants to submit the grievance to arbitration. Ex. A-1, § 9.3(a), UAW 000043.  Once a timely request for arbitration is made under Section 9.3(a) of the CBA, the parties are required to meet "promptly" to attempt to agree on an arbitrator.  *Id.*  In the event the parties cannot agree on an arbitrator, Section 9.3(a) requires them to select an arbitrator from a list provided by the Federal Mediation and Conciliation Service.  *Id.*

68.     The arbitrator is to "expeditiously" schedule a hearing, and the arbitrator's decision is "final, binding and conclusive."  Ex. A-1, § 9.3(c), 9.4(e), UAW 000043-044.

69.     On November 24, 2020, the Union timely submitted a grievance to Spirit seeking redress for the Company's systematic violations of the CBA, a copy of the grievance is included in the Appendix as Exhibit A-6 and is incorporated herein by reference.  After the Company denied the grievance at Step 3 on December 16, 2020, the Union took the Grievance to Step 4, where after stalling for several weeks, the Company again denied the Grievance. Ex. A-13.

70.     On February 12, 2021, although the Company was delinquent in its Step 4

response, the Union demanded that the Grievance "be moved immediately to the arbitration step of the grievance procedure and that the Company agree to expedite the arbitration process" in light of the Company's imminent plan to eliminate 127 bargaining unit jobs, and the fact that the Company had continued to relocate the work and had even appeared to have sped up the process while the parties were going through the contractual grievance procedures.  Ex. A-12.  That same afternoon, February 12, the Company finally gave its Step 4 response, denying the Grievance and suggesting that the Union withdraw it and resume discussions about the effect of the closing of the Plant on the employees. Ex. A-13.  Spirit has refused to even temporarily delay the closing of the Plant pending arbitration, as the Company is seeking to complete the shutdown before the matter can be heard by an arbitrator.

### Count One -- Injunction in Aid of Arbitration

71.     The Union incorporates all of the foregoing paragraphs of the Complaint by reference as if such paragraphs were fully set forth verbatim herein.

72.     Count One is asserted against both Defendants, jointly and severally.

73.     The Union invokes the Court's equity power to issue injunctive relief in aid of labor arbitration.

74.     In accordance with Fed. R. Civ. P. 65, the Union, after hearing, is entitled to a preliminary injunction as follows, pending arbitration of the Union's Grievance and issuance of the arbitrator's decision and award.

    a.   Restraining and enjoining Defendants Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc., their officers, employees, agents, representatives, and those acting in concert or participation with them, to cease and desist from proceeding in any manner or taking any steps to effect the permanent closing of the Plant and relocation of the bargaining unit's work to other Spirit facilities

pending final arbitration of the Union's Grievance and further order of this Court, including, without limitation, to cease and desist from doing any of the following:

  i.   relocating or diverting any of the work of the McAlester bargaining unit to any other Spirit facility,

  ii.  relocating or diverting any of the work of the McAlester bargaining unit to any third party,

  iii. assigning any of the work of the McAlester bargaining unit to any other location or facility,

  iv.  laying off or discharging any members of the McAlester bargaining unit in connection with the planned relocation of the work to other facilities,

  ii.  moving, abandoning, or selling any of the McAlester Plant's machinery, equipment, and tools to any other facility,

  iii. listing or advertising that the Plant and/or the real property on which it is situated is for sale or lease,

  iv.  selling, abandoning, dismantling, or otherwise disposing of the Plant and the real property on which it is situated, or

  v.   laying off or otherwise discharging any members of the McAlester bargaining unit.

b. Affirmatively requiring and enjoining Defendants Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc., their officers, employees, agents, representatives, and those acting in concert or participation with them to do all

of the following within 14 days of the date of the Court's order granting injunctive relief:

    i.    return any of the McAlester bargaining unit work that has been relocated or diverted from the McAlester Plant at any time since October 1, 2020,

    ii.    reassign any of the McAlester bargaining unit work that has been assigned to any other facility since October 1, 2020, and

    iii.    return to the McAlester Plant any machinery, tools, equipment, work plans, work processes, or work instructions that have been moved from the McAlester Plant at any time since October 1, 2020.

75.    Immediate, substantial, and irreparable injury to the contractual and property rights of the Union and more than 125 represented employees will result unless the requested relief is granted promptly.

76.    As to each item of relief, greater injury will be inflicted on the Union by the denial of relief than will be inflicted upon Spirit by the granting of relief.

77.    The Union has no adequate remedy at law.

78.    The balance of the equities is in favor of the Union, and the public interest in the peaceful resolution of labor disputes through arbitration supports an injunction.

79.    The Union has fulfilled all obligations imposed by law in this labor dispute and has made every reasonable effort to settle the dispute by negotiations prior to the filing of this complaint. The Union has informed Spirit of its decision to invoke arbitration in this dispute, and the Union's Grievance is subject to final and binding arbitration under the CBA.

80.    Arbitration would be futile and would be rendered a hollow formality unless the

Court grants injunctive relief to maintain the status quo pending arbitration. Accordingly, the only remedy available to the Union that would be substantial, complete and adequate to prevent irreparable injury is the equitable remedy of a preliminary injunction to maintain the status quo until an arbitrator has rendered a decision with respect to the Union's Grievance.

## Prayer

WHEREFORE, Plaintiffs International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America and its Local 1558 request the following relief:

1. The Court enter an order setting a date for an expedited hearing on Plaintiffs' motion for preliminary injunction and requiring Defendants to appear and show cause why a preliminary injunction in this matter should not be granted:

2. The Court grant a preliminary injunction at the conclusion of the hearing as follows:

   a. Restraining and enjoining Defendants Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc., their officers, employees, agents, representatives, and those acting in concert or participation with them, to cease and desist from proceeding in any manner or taking any steps to effect the permanent closing of the Plant and relocate the bargaining unit's work to other Spirit facilities pending final arbitration of the Union's Grievance and further order of this Court, including, without limitation, to cease and desist from doing any of the following:

      v. relocating or diverting any of the work of the McAlester bargaining unit to any other Spirit facility,

      vi. relocating or diverting any of the work of the McAlester bargaining unit to any third party,

vii.   assigning any of the work of the McAlester bargaining unit to any other location or facility,

viii.   laying off or discharging any members of the McAlester bargaining unit in connection with the planned relocation of the work to other facilities,

iv.   moving, abandoning, or selling any of the McAlester Plant's machinery, equipment, and tools to any other facility,

v.   listing or advertising that the Plant and/or the real property on which it is situated is for sale or lease,

vi.   selling, abandoning, dismantling, or otherwise disposing of the Plant and the real property on which it is situated, or

vii.   laying off or otherwise discharging any members of the McAlester bargaining unit.

c.   Affirmatively requiring and enjoining Defendants Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc., their officers, employees, agents, representatives, and those acting in concert or participation with them to do all of the following within 14 days of the date of the Court's order granting injunctive relief:

i.   return any of the McAlester bargaining unit work that has been relocated or diverted from the McAlester Plant at any time since October 1, 2020,

ii.   reassign any of the McAlester bargaining unit work that has been assigned to any other facility at any time since October 1, 2020, and

       iii.    return to the McAlester Plant any machinery, tools, equipment, work plans, work processes, or work instructions that have been moved from the McAlester Plant at any time since October 1, 2020.

3.      The Union be awarded reasonable attorneys' fees and costs of court; and

4.      The Court grant such other and further relief to which the Union may be justly entitled.

Dated February 23, 2021.

Respectfully submitted,

/s/ Mark Bonner
**Mark Bonner**
Oklahoma Bar No. 14541
lmb@nemw.com
**Norman & Edem, PLLC**
127 Northwest 10th Street
Oklahoma City, OK  73103
405.272.0200 (phone)
405.235.2949 (fax)

**Rod Tanner** [Motion Pro Hac Vice Pending]
Texas Bar No. 19637500
rtanner@rodtannerlaw.com
**Jamie King Harrison** [Motion Pro Hac Vice Pending]
Texas Bar No. 11449230
jharrison@rodtannerlaw.com
**Aarika Johnson** [Motion Pro Hac Vice Pending]
Texas Bar No. 24120927
ajohnson@rodtannerlaw.com
**Tanner and Associates, PC**
6300 Ridglea Place, Suite 407
Fort Worth, Texas 76116-5706
817.377.8833 (phone)
817.377.1136 (fax)

Attorneys for Plaintiffs

**Verification**

I, David Barker, an International Representative for Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (*UAW*), am authorized to make this verification on behalf of both UAW and its Local 1558. I have read the foregoing Complaint and the factual statements contained therein are true and correct and are based on my own personal knowledge except those factual statements based on information and belief, and as to those factual statements, I believe them to be true.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 23rd day of February 2021.

**David Barker**